# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| **DR. FELECIA DAILEY,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | Civil Action Number |
| **v.** | ) | **2:14-cv-1807-AKK** |
| | ) | |
| **BLUE CROSS BLUE SHIELD OF** | ) | |
| **ALABAMA,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION AND ORDER

Felecia Dailey brings this action against Blue Cross Blue Shield of Alabama ("BCBS"), pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* ("Title VII"), and 42 U.S.C. § 1981 ("section 1981"), alleging race and gender discrimination and retaliation with respect to four promotion decisions. Doc. 32 at 1. The court has for consideration BCBS's motion for summary judgement, doc. 42, which is fully briefed, docs. 43; 57-1; 59, and ripe for review. For the reasons stated below, except for the claims related to Dailey's second application for Application Development Manager (Counts V and VI), the motion is due to be granted.

# I.    STANDARD OF REVIEW

Under Fed. R. Civ. P. 56(a), summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." To support a summary judgment motion, the parties must cite to "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations, admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c). Moreover, "Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The moving party bears the initial burden of proving the absence of a genuine issue of material fact. *Id*. at 323. The burden then shifts to the nonmoving party, who is required to "go beyond the pleadings" to establish that there is a "genuine issue for trial." *Id*. at 324 (citation and internal quotation marks omitted). A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The court must construe the evidence and all reasonable inferences arising from it in the light most favorable to the non-moving party. *Adickes v. S. H. Kress*

& *Co.*, 398 U.S. 144, 157 (1970); *see also Anderson*, 477 U.S. at 255 (all justifiable inferences must be drawn in the non-moving party's favor). Any factual disputes will be resolved in the non-moving party's favor when sufficient competent evidence supports the non-moving party's version of the disputed facts. *See Pace v. Capobianco*, 283 F.3d 1275, 1276 (11th Cir. 2002) (a court is not required to resolve disputes in the non-moving party's favor when that party's version of events is supported by insufficient evidence). However, "mere conclusions and unsupported factual allegations are legally insufficient to defeat a summary judgment motion." *Ellis v. England*, 432 F.3d 1321, 1326 (11th Cir. 2005) (per curiam) (citing *Bald Mountain Park, Ltd. v. Oliver*, 863 F.2d 1560, 1563 (11th Cir. 1989)). Furthermore, "[a] mere 'scintilla' of evidence supporting the opposing party's position will not suffice; there must be enough of a showing that the jury could reasonably find for that party." *Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990) (citing *Anderson*, 477 U.S. at 252).

## II.    FACTUAL BACKGROUND

Dailey, who is an African-American female, has worked for BCBS for over nineteen years, beginning initially as a part-time consultant. Docs. 32 at 2; 44-1 at 4. Dailey became a full-time employee in 1998 as a Systems Analyst, and moved into her current role as a Senior Database Administrator in the Database Administration ("DBA") Department also in 1998. Doc. 44-1 at 4–5. In this

capacity, Dailey "work[s] with the application developers reviewing code" to make sure it is "consistent and adheres to standards," and on data modeling to implement new database designs to tables, and to ensure that tables and databases are backed up consistently. *Id.* at 5.

Dailey challenges four selection decisions in this case. According to Dailey, her experience as a Senior Database Administrator, her education (a Bachelor of Science in Computer Science, Masters of Business Administration, and a Doctorate of Management), doc. 44-4 at 17, and her overall work[1] and life experience made her the best candidate for these positions.

### A. DBA Manager and DBA-IM Manager Positions

In January 2013, Dailey submitted applications for DBA Manager and DBA-Information Management Manager ("DBA-IM Manager"). Doc. 44-4 at 3, 11–12, 14–16. The DBA Manager supervises the DBA Department, and the DBA-IM Manager supervises a focused group of DBA Administrators tasked with information management. *Id.* at 2. Both positions required "success in a leadership role" and considered "[p]rior management experience" as "a plus." *Id.* at 11–12.

---

[1] Dailey's previous work experience includes working as a Staff Systems Engineer and Team Leader at AmSouth Bank where she "[d]irected and facilitated a team of six," doc. 44-4 at 19, and as a Senior Programmer Analyst at Ingalls Shipbuilding, where, among other things, Dailey "[l]ed development and implementation efforts," "[c]oordinated system development," and was "[d]irectly responsible for the management and oversight of batch cycle execution." *Id.*

*1. DBA-Manager*

Jim Dorris (the Department Manager of Technology Support and the supervisor for both positions) and Brice Baumann (the Senior Recruiting Consultant) interviewed Dailey and three other applicants selected from sixteen internal candidates. *Id.* at 3. At the end of her interview, when Dailey asked about the next step in the process, Dorris responded "that it was all about the noise and the Gayles and the Scotts, that he would repost the position if he needed to." Doc. 44-1 at 7. Dailey interpreted this comment to mean that Dorris preferred white candidates and would not select her because of her race: "my speculation is that I did not look like Gail and Scott, so, therefore, I didn't have an opportunity, Gail being a Caucasian female and Scott being a Caucasian male." *Id.*; *see also* doc. 57-1 at 9. Although Dorris denies making this comment, he testified that Gail Myers and Scott Davis are Dailey's coworkers and that Scott Davis applied for the two positions. Doc. 44-5 at 41.

Ultimately, Dorris and Baumann found Dailey qualified technically, but lacking in interpersonal skills and managerial experience. Doc. 44-4 at 4. Moreover, because all four finalists met the required level of technical skills, Dorris asserts that he decided he wanted someone who would make a good team manager. *Id.* at 3. Dorris added that Dailey was not the best candidate because Dailey lacked management experience at BCBS, had negative reviews from her

previous manager regarding her interpersonal interactions with team members and internal customers, and due to Dorris' own observations of Dailey through customer service complaints he received and by noticing that Dailey often kept to herself. Docs. 44-1 at 13; 44-4 at 4, 17–19; 44-5 at 21–25; 44-6 at 3.

Dailey's purported lack of interpersonal skills is well documented. Doc. 44-3 at 55–56, 62–63, 69. Despite receiving "exceeds expectations" overall in her annual evaluations, Dailey's most consistent critical feedback centered on the need to improve in her communication and interactions with customers and coworkers. *Id.* at 41–44, 55, 62, 69. In performance reviews from July 2001 to July 2003, for example, Dailey's managers described Dailey as projecting the impression that she did not like for customers and coworkers to approach her, and noted that Dailey needed to improve her communication skills. *Id.* Notably, in July 2002, Dailey's then manager wrote that Dailey had "the lowest [customer surveys] of the DBA group" and that customers described Dailey as impatient and "not truly listening" to their issues. *Id.* at 62. Dailey disagrees with this assessment and, in her July 2012–July 2013 performance evaluation, countered with positive reviews that she has received from customers. *Id.* at 45–47.

Dorris and Baumann selected David George for the DBA Manager position based, in part, on his management experience. Doc. 44-4 at 4. George's experience included fourteen years of hands-on technical experience with desktop applications

and programming, including working in systems analysis, programming, and IT support. Doc. 44-4 at 4, 24–27. George also had management experience at BCBS and five years' experience with a previous employer that included supporting a 30-site system. Doc. 44-4 at 4, 24–27. In addition to George's experience, Dorris also selected him because Dorris previously worked with George when George managed BCBS's move to a newly built data center, during which Dorris observed George's work and leadership skills, including George's positive interactions with the Database Administrators, successful navigation of the team as the "day-to-day guy" to solve problems, and facilitating interactions among divergent groups. Docs. 44-4 at 4; 44-5 at 17–19.

After his selection, George became Dailey's manager. In George's July 2012–2013 performance review of Dailey, he scored Dailey an overall "Exceeds Expectations," but also reported that Dailey needed development in fostering teamwork and communicating with customers. Docs. 44-3 at 39–44; 57-1 at 12. George included documentation of customer feedback in the evaluation, in which multiple customers described Dailey "as plain difficult," "condescending," "just too hard to get along with," "argumentative and difficult," and "tiresome to work with." Doc. 44-3 at 39–52. Dailey wrote a rebuttal to the evaluation, and George followed up with guidance on how Dailey could improve. *Id.* at 45–49. Dailey challenges the accuracy of this evaluation, and believes that Dorris and George

conspired to ensure she received negative reviews and evaluations in this area to prevent her from receiving future promotions. Docs. 44-5 at 43; 57-1 at 12–13.

### 2. *DBA-IM Manager*

BCBS closed the DBA-IM Manager position after determining that none of the applicants had the necessary skillset. Doc. 44-4 at 5. A second posting in May 2013 generated more applicants, including Alan Mims to whom BCBS offered the position. *Id.* At the time of his selection, Mims held the Project Director position at BCBS's national healthcare data warehouse, a position in which he delivered data-driving information about healthcare trends and best practices. *Id.* at 5, 40. In addition to Mims' experience in analytics, *id.* at 4, 40–41, Mims' positive interactions with others, as observed by Dorris, and his role as Project Director indicated to Dorris that Mims had the leadership skills for the DBA-IM position. *Id.*; *see also* doc. 44-5 at 33. However, Mims turned down the offer and the role remained vacant. Doc. 44-5 at 33.

### 3. *Second DBA-Manager Vacancy*

After George worked successfully in the DBA Manager role, the Vice President of Technology Support transferred George into the vacant DBA-IM Manager position that Mims turned down. Docs. 44-4 at 5–6; 44-5 at 34. As a result, BCBS re-posted the DBA Manager position. However, BCBS closed the posting because it deemed none of the candidates viable. Doc. 44-4 at 6. When

Atlee Dinsmore, an Application Development Manager, expressed interest in the position in October 2013, BCBS transferred Dinsmore laterally based on his experience as a manager, and the positive recommendations he received from other department managers and supervisors. Docs. 44-4 at 6; 44-5 at 38. As a lateral transfer, BCBS only needed upper management approval of the appointment in lieu of a formal application process. Doc. 44-4 at 6.

### 4. First EEOC Charge

In light of the decision to bypass her for these positions, Dailey filed a charge with the Equal Employment Opportunity Commission, alleging race and gender discrimination. Doc. 44-1 at 126.

### B. Application Development Manager Position 1

In December 2014, after Dailey filed this lawsuit, Dorris, in his new role as Department Manager of Application Development, posted an opening for an Application Development Manager. Docs. 44-4 at 6; 44-6 at 2. The posting listed management experience as "strongly preferred," because the position had oversight for eighteen employees, including an employee with a "significant performance issue" on a performance improvement plan ("PIP"). Docs. 44-4 at 7, 29; 44-5 at 45. Perhaps because of the PIP, Dorris explained that he did not feel comfortable placing a first time manager in this role. Docs. 44-4 at 7; 44-5 at 45. As a result,

Dorris asked Baumann to screen applicants for management experience. Docs. 44-4 at 7; 44-6 at 2.

Baumann separated the seventeen applicants into three categories: (1) managerial experience; (2) no managerial experience (Dailey's group); and (3) not qualified. Doc. 44-6 at 3. Dorris, in turn, interviewed the three applicants Baumann identified as having management experience, and consulted with an interview panel consisting of five Department Managers in Application Development to discuss the remaining candidates. Doc. 44-4 at 7. The panel decided to interview three additional applicants "to provide them with interview experience," even though the panel determined they were not viable candidates. *Id.* The three individuals in this group "had significant application development experience and had been identified as potential management candidates in the Application Development department previously." *Id.* at 7–8.

The panel did not interview Dailey because "she lacked management experience in a work environment and [did not] have the senior level application development experience," both "preferred" qualifications. Doc. 44-6 at 3, 6. Indeed, Baumann conveyed this point to Dailey when Dailey requested feedback, telling Dailey that she did not have the preferred management experience or the three or more years of recent senior level application experience. Docs. 44-1 at 13–14; 44-6 at 3. When Dailey pointed to her extracurricular leadership experience as

evidence of management experience,[2] Baumann told her that non-work related leadership is not comparable to workplace management experience. Docs. 44-1 at 13–14; 44-6 at 3.

Ultimately, BCBS selected Bruce Smith, who had over ten years of supervisory[3] work experience and experience in application development, for the position. Doc. 44-4 at 8, 37–38. However, the interview panel opted to transfer Rick Mattson — already an Application Development Manager — into the position, because he had recently handled a problematic employee situation successfully and had the necessary supervisory and application development experience. *Id.* at 8–9. As a result, the panel placed Smith into Mattson's vacated Application Development Manager role. *Id.* at 9.

---

[2] Dailey has earned the titles of Advanced Communicator Bronze ("ACB") and Advanced Leader Bronze ("ALB") in Toastmasters International, and served as the Division Governor and Vice President of Public Relations from 2013–2014, Area Governor and Secretary from 2012–2013, and Vice President of Membership from 2011–2012 for her district chapter. *Id.* at 19; 34. Dailey's other civic involvement includes serving as the Co-Chair and Chair of Technology, Information & Communications from 2007–2014, of Delta Sigma Theta Sorority, where she managed a "team of 10 diverse IT professionals in the delivery of quality technological solutions in web development, directing processes for deliverables," *id.* at 19, 34; the Chair for the Visiting Allocations Team for United Way of Central Alabama in 2011, "[g]uid[ing] a team of 20 volunteers in reviewing program effectiveness and efficiency," *id.* at 19, 34; the Third Vice President to the Central Alabama Chapter of the National Coalition of 100 Black Women, Inc., *id.* at 34; and Treasurer for the Russet Meadow Homeowners Association since 2014, *id.*

[3] Smith worked in supervisory capacities for over twelve years at AT&T/Bellsouth. Doc. 44-4 at 37. In January 2013, Smith accepted a supervisor position at BCBS as a Senior IT Project Manager/Portfolio Manager, which consisted of providing support to department managers. *Id.*

*1. Second EEOC Charge*

After the transfer of Mattson and the selection of Smith, Dailey filed her second EEOC charge, alleging that BCBS denied her these two positions because of race and gender discrimination, and in retaliation for her protected activity. Doc. 44-1 at 138.

## C. Application Development Manager Position 2

Two months after Dailey's second EEOC charge, BCBS posted another Application Development Manager vacancy. Doc. 44-7 at 3. This position entailed leading a team working on a new application development project for claims processing. *Id.* As such, Kit Heifner — the supervisor for this position — "needed someone with experience as a Unit Manager in Application Development" to implement this particular project. *Id.* Therefore, he transitioned Jim Merrell —an Application Development Manager — into the role, and posted Merrell's position in June 2015. *Id.* at 3, 13.

Dailey was one of sixteen applicants who met the required qualifications. *Id.* at 3. Heifner and Human Resources screened this group further for senior level application and claims application development experience — both preferred qualifications. *Id.* at 3–4, 7. From this group, Human Resources determined that six candidates had claims application development experience. *Id.* at 3. According to Heifner, "Dailey was not selected for interview because human resources

determined that she did not have the senior level claims application development experience or the recent application development experience as she has worked in database administration since 1998." *Id.* at 3–4.

Heifner selected Tal Richardson, Senior IT Project Manager, for the position, because he had claims application development experience supporting ancillary applications, and had served as a Senior Applications Systems Analyst/Programmer from 1994–2014, where he spent the majority of his time supporting claims in BCBS's Application Development Department. *Id.* at 4, 10–11, 13. Although Richardson had held the Senior IT position for less than a year, *id.* at 4, and was not eligible to apply for internal postings under the Corporate Operating Policy on Job Opening[s] ("COP"), *id.* at 15, BCBS contends that it properly selected Richardson because it posted the position externally. *Id.* at 5, 18.

### 1. *Third EEOC Charge*

After Richardson's selection, Dailey filed her third EEOC charge, alleging race and gender discrimination, and retaliation. Doc. 44-1 at 145.

## III. ANALYSIS

Dailey pleads discrimination and retaliation claims, pursuant to Title VII and section 1981, for the DBA Manager and DBA-IM Manager positions (Counts I and II); and the two Application Development Manager positions (Counts III, IV, V, and VI). *See generally* doc. 32.

Since Title VII and section 1981 claims "have the same requirements of proof and use the same analytical framework, [the court] shall explicitly address [Dailey's] Title VII claim[s] with the understanding that the analysis applies to the [section] 1981 claim[s] as well." *Standard v. A.B.E.L. Servs., Inc.*, 161 F.3d 1318, 1330 (11th Cir. 1998). The court applies the burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), for Dailey's race and gender discrimination and retaliation claims since this is a circumstantial evidence case. The *McDonnell Douglas* framework first "requires the plaintiff to create an inference of discrimination[4] [or retaliation][5] through her *prima facie* case." *Springer v. Convergys Customer Mgmt. Grp.*, 509 F.3d 1344, 1347 (11th Cir. 2007) (citing *McDonnell Douglas Corp.*, 411 U.S. at 802) (discrimination); *Hairston v. Gainesville Sun Pub. Co.*, 9 F.3d 913, 919 (11th Cir. 1993) (retaliation). If the plaintiff satisfies her initial burden, "then the defendant must show a legitimate, non-discriminatory [or non-retaliatory] reason for its employment action." *Burke-Fowler v. Orange Cty.*, 447 F.3d 1319, 1323 (11th Cir.

---

[4] To establish a *prima facie* case of discrimination on the basis of a failure to promote, Dailey must demonstrate that "(i) she belonged to a protected class; (ii) she was qualified for and applied for a position; (iii) despite qualifications, she was rejected; and (iv) the position was filled with an individual outside the protected class." *Springer*, 509 F.3d at 1348 n.2 (citing *McDonnell Douglas Corp.*, 411 U.S. at 802*; Vessels v. Atlanta Indep. Sch. Sys.*, 408 F.3d 763, 768 (11th Cir. 2005)).

[5] To establish a *prima facie* case of retaliation, Dailey "must present evidence that: (1) [s]he engaged in statutorily protected conduct; (2) [s]he was adversely affected by an employment decision; and (3) there was a causal connection between the statutorily protected conduct and the adverse employment decision." *Drago v. Jenne*, 453 F.3d 1301, 1307 (11th Cir. 2006).

2006) (citation omitted); *see also Hairston*, 9 F.3d at 919. A defendant "need not persuade the court that it was actually motivated by the proffered reasons. It is sufficient if the defendant's evidence raises a genuine issue of fact as to whether it discriminated against the plaintiff," and the defendant "need only produce admissible evidence which would allow the trier of fact rationally to conclude that the employment decision had *not* been motivated by discriminatory animus." *Combs v. Plantation Patterns*, 106 F.3d 1519, 1527 (11th Cir. 1997) (citations and internal quotation marks omitted) (emphasis in original).

If the defendant meets this burden, "then the plaintiff must prove that the reason provided by the defendant is a pretext for unlawful discrimination [or retaliation]." *Burke-Fowler*, 447 F.3d at 1323 (citation omitted); *see also Hairston*, 9 F.3d at 919–21. That is, the plaintiff must produce evidence "sufficient to permit a reasonable factfinder to conclude that the reasons given by the employer were not the real reasons for the adverse employment decision." *Combs*, 106 F.3d at 1527. In other words, a plaintiff must show that the defendant's proffered reasons were pretextual — that race, gender, or retaliation, in fact, motivated the defendant's decision. *Harrell v. Ala. Dep't of Educ.*, 342 F. App'x. 434, 436 (11th Cir. 2009). "The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated [or retaliated] against the plaintiff remains at all times with the plaintiff." *Springer*, 509 F.3d at 1347 (citation omitted).

The court turns now to the parties' respective contentions.

**A. DBA Manager and DBA-IM Manager Positions (Counts I & II)**

Dailey pleads that BCBS denied her the DBA Manager and DBA-IM Manager positions awarded to George and Dinsmore, both Caucasian males, because of her race and gender. Doc. 32 at 10–12. BCBS concedes that Dailey met the basic qualifications for both positions. Docs. 43 at 22–23; 44-5 at 26. Therefore, Dailey has met her burden of establishing a *prima facie* case.

As such, the burden shifts to BCBS to show a "legitimate, non-discriminatory reason for its employment action." *See Burke-Fowler*, 447 F.3d at 1323. BCBS has met this burden by explaining that Dorris hired George (first, for DBA Manager and then for DBA-IM Manager), and Dinsmore (for the DBA Manager position George left vacant), because Dorris believed they were better qualified than Dailey due to their success in leadership roles and prior management experience. Docs. 43 at 26; 44-4 at 4–6, 11–12; 44-5 at 29. Indeed, George's resume demonstrates that he served in a managerial role prior to his selection. Doc. 44-4 at 26–27. As for Dinsmore, he was already an experienced BCBS manager and his lateral transfer to the DBA Manager position only required upper management approval. *Id.* at 6, 26–27. In contrast to George and Dinsmore, Dailey lacked management experience at BCBS and had received multiple negative reviews regarding her interpersonal skills, including from her most recent manager.

Docs. 44-1 at 6, 13; 44-3 at 55–56, 62–63, 69; 44-4 at 2, 4–5, 17–19; 44-5 at 21–25, 28; 44-6 at 3. These explanations qualify as "legitimate, non-discriminatory" reasons. *See EEOC v. Alton Packaging Corp.*, 901 F.2d 920, 925 (11th Cir. 1990) (promoting someone who is more qualified is a nondiscriminatory reason); *Steger v. Gen. Elec. Co.*, 318 F.3d 1066, 1076 (11th Cir. 2003) ("A defendant may not merely state that the employment decision was based on the hiring of the 'best qualified' applicant but must articulate specific reasons . . . such as 'seniority, length of service in the same position, personal characteristics, general education, technical training, experience in comparable work or any combination' of comparable criteria").

Accordingly, the burden shifts to Dailey to prove pretext. *See Burke-Fowler*, 447 F.3d at 1323. To do so, Dailey contends first that BCBS's proffered reasons for selecting George for the DBA Manager position are pretextual, because "[n]othing about Mr. George's resume indicates that he had any experience specific to data base operations," that George who had only worked in application development did not have the required five or more years of database experience, and that Dorris selected George due to a prior relationship, George's personality, and Dorris' professed "gut feeling" that Dailey was not the best candidate for the position. Doc. 57-1 at 9–11; *see also* doc. 44-5 at 31.

There are several problems with Dailey's contentions. First, while it may prove unfair to hire someone because of a prior relationship, personality, or "gut feeling," "[u]nfair treatment, absent discrimination based on race, sex, or national origin, is *not* an unlawful employment practice under Title VII [or section 1981]." *Coutu v. Martin Cty. Bd. of Cty. Comm'rs*, 47 F.3d 1068, 1074 (11th Cir. 1995) (emphasis in original). Second, technical prowess was not the primary reason BCBS cited for selecting George — rather, BCBS claims it selected him "due to his demonstrated leadership skills, management experience, and interpersonal skills." Doc. 44-4 at 4. Specifically, BCBS states that during an assignment that involved George managing BCBS's move to a newly built data center, Dorris "observed George's ability to successfully navigate a team to solve problems, and to facilitate interactions across a spectrum of divergent groups." Doc. 43 at 6; *see also* docs. 44-5 at 18–19 (the new data center project role George took on for about two years required "interact[ing] with facilities people, with contractors. And then the big lift was interaction with all of our technology people at Blue Cross"); 44-5 at 28 (when asked "What separated Mr. George from [Ajay, Dailey, and Stotter]?" Dorris responded, "Experience, and then just his ability to interact with people."). In addition to the experience with the new data center, Dorris explained that George's management experience also included "managing a team of people for Cahaba [a BCBS entity]" as a unit manager dealing with tech support, doc. 44-5 at

28, through which George also demonstrated his ability to get along well with other people. *Id.* at 28–29. Significantly, other than noting her own management experience, Dailey offered no evidence to challenge Dorris' contentions about George's management experience. Accordingly, even if Dailey is correct that George lacked the requisite database experience — a contention BCBS challenges, *see* docs. 44-4 at 25–27; 59 at 3, Dailey has failed to meet her burden to rebut BCBS's other reasons for hiring George — *i.e.*, namely, his success as a manager at BCBS. *See Crawford v. City of Fairburn*, 482 F.3d 1305, 1308 (11th Cir. 2007) ("If the employer proffers more than one legitimate, nondiscriminatory reason [for its actions], the plaintiff must rebut each of the reasons to survive a motion for summary judgment.").

Next, with respect to Dinsmore, Dailey contends that BCBS's proffered reasons are pretextual, because Dinsmore had no experience on the "database side of the operation," doc. 57-1 at 25, that BCBS is offering "shifting" and "inconsistent post hoc explanations for its employment decisions," *id.*, and that "Dorris hired only white male candidates to fill positions as his direct reports or unit mangers [*sic*] . . . ," *id.* at 10. These contentions are unavailing, however, because they do not address the reason BCBS articulated for selecting Dinsmore, *i.e.*, (1) that Dinsmore "was already an experienced [BCBS] manager," doc. 44-4 at 6, (2) Dorris "received positive recommendations and support of [Dinsmore] from

other department managers and management supervision," *id.*, and (3) Dinsmore requested a lateral transfer, *id. See also* docs. 32; 43 at 10; 44-1 at 128; 57-1. Again, "[i]f the employer proffers more than one legitimate, nondiscriminatory reason [for its actions], the plaintiff must rebut each of the reasons to survive a motion for summary judgment." *Crawford*, 482 F.3d at 1308. While Dailey may believe that Dorris "made up different criteria" each time he tried to fill the DBA-Manager or DBA-IM Manager positions "so as to disqualify Dr. Dailey," *see* doc. 57-1 at 25–26, this belief is insufficient to establish that BCBS's reasons for transferring Dinsmore laterally are pretextual.[6]

In promotion cases, a plaintiff must do more than "assert[] baldly that he was better qualified than the person who received the position at issue." *Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1089 (11th Cir. 2004). Also, a plaintiff cannot establish pretext "merely by questioning the wisdom of the employer's reason," if the reason is one that "might motivate a reasonable employer." *Combs*, 106 F.3d at 1543. While Dailey may not like the decision, a desire to select a candidate with management experience "might [in fact] motivate a reasonable employer." *See id.* Therefore, because "federal courts do not sit as a super-personnel department that

---

[6] To further support her claim, Dailey points to Dorris' original selection of Mims for the DBA-IM Manager position prior to BCBS laterally transferring Dinsmore to the position, and notes that Mims had no management experience. Doc. 57-1 at 23–24 ("Similarly, when it came to fill the DBA-IM position Dorris evidently did not see management experience as a preference or requirement, because Mims possessed none."). Dailey's contention overlooks BCBS's reasons for selecting Mims — *i.e.*, his experience and leadership in analytics as the Project Director, and his positive interactions with others. Docs. 44-4 at 4–5, 40–41; 44-5 at 33.

reexamines an entity's business decisions," *Elrod v. Sears, Roebuck & Co*., 939 F.2d 1466, 1470 (11th Cir. 1991), and Dailey has not demonstrated that the disparities between her qualifications and the successful applicants are "of such weight and significance that no reasonable person, in the exercise of impartial judgment, could have chosen the candidate[s] selected over [Dailey]," *Harrell*, 342 F. App'x at 436 (citations omitted), the court finds Dailey has failed to establish that "no reasonable person" could have chosen George or Dinsmore over her, or that BCBS selected them over her because of race or gender discrimination.[7]

## B. Application Development Manager Position 1 (Counts III & IV)

The next position Dailey challenges is for Application Development Manager. Dailey contends that BCBS selected Bruce Smith and Rick Mattson, both Caucasian males, because of race and gender animus, and in retaliation for her first EEOC charge. Docs. 32 at 5–6; 44-5 at 42–43. The court assumes that Dailey can make a *prima facie* case, *see* doc. 43 at 26 (BCBS challenges only whether

---

[7] As further evidence of pretext, Dailey contends that BCBS has an overall "culture of exclusion towards African-American females." Doc. 57-1 at 27. To support this contention, Dailey cites text message conversations she had with another female employee, *see id*. at 17–18, where that employee discussed her own unsuccessful experiences applying for BCBS's Management Candidate Program three times and being denied non-management related positions despite having an M.B.A., a Juris Doctorate, and a Masters of Law in Financial Services and Taxation. *Id*. at 17–18; *see also* doc. 53-1 at 7, 16. However, this evidence falls short of establishing the necessary pretext, in part, because this other employee has not applied for or worked in the departments at issue in this case, *see generally* doc. 53-1, and she does not contend that she believed BCBS discriminated against her because of her race or gender. *See id*. at 16. In fact, for one of the positions the employee mentioned, she testified that she could see why BCBS selected the successful candidates. *See id*. at 17. Therefore, even ignoring the hearsay nature of the text messages, the court does not view this additional evidence as relevant to its pretext analysis.

Dailey can show pretext), and moves to the next step of the analysis. As a "legitimate, non-discriminatory reason for its employment action," *see Burke-Fowler*, 447 F.3d at 1323, BCBS explains that Dorris selected Smith and Mattson, because of their managerial experience. Doc. 43 at 27–28. BCBS adds that it listed management experience as a "strongly preferred" qualification in the job listing because the person selected would have the responsibility for supervising eighteen employees, including one on a PIP. Docs. 44-4 at 7, 29; 44-5 at 45. Relevant here, unlike Dailey who lacked work management experience, *see* doc. 44-4 at 8, Smith had fifteen years of such supervisory experience*, see id.* at 8, 37–38, and Mattson — already an Application Development Manager at BCBS — had supervisory experience that included successfully managing a problematic employee situation. *Id.* at 8. Mattson's experience led BCBS to believe he was well-suited to handle the employee on a PIP. *Id.* As a result, BCBS transferred Mattson laterally to the new Application Development Manager position, and placed Smith, the successful candidate from the job posting, in Mattson's former position. *Id.* at 8–9. These explanations qualify as "legitimate, non-discriminatory" reasons. *See Steger*, 318 F.3d at 1076.

### 1. *Race And Gender Discrimination*

To show pretext, Dailey challenges the preference for management experience, stating that just because a position expresses a strong preference for

management experience does not mean that management experience is required for that position. Doc. 57-1 at 26. According to Dailey, Dorris' failure to consider her for the position is further proof that "Dorris was not going to promote [her] under any set of circumstances," because of his belief that Dailey lacked the skillset to be a manager,[8] docs. 44-5 at 46; 57-1 at 26, and that the decision is further proof of a purported culture of excluding African-American females from management opportunities.[9] Doc. 57-1 at 17–19, 27. As an initial matter, that a position prefers, rather than requires, management experience does not mean that an employer should ignore candidates with demonstrated management experience in favor of one who has none. This is especially the case where, as here, BCBS explains that it preferred management experience because the person selected would have to supervise eighteen people, including one on a PIP with significant issues. That this reason is not pretextual is evident by the fact that even after BCBS selected Smith, when a more seasoned manager expressed interest, it laterally transferred that seasoned manager to the position requiring the supervision of the employee on the PIP, and placed Smith in that manager's former position. Doc. 44-4 at 8–9.

---

[8] When asked — in regard to the Application Development Manager position, "You just didn't think [Dailey] had what it took – to be a manager?" Dorris responded, "That's right." Doc. 44-5 at 46.

[9] Dailey cites again to the text messages with one of her African-American, female coworkers. For the same reasons stated *supra* note 7, this reliance on her coworker falls short of establishing pretext.

Ultimately, Dailey has presented no evidence that Dorris' belief that she is not management material is based on gender or racial animus, rather than on the demonstrated reports regarding Dailey's interpersonal skills. "The concerns with employment decisions that can be addressed by a Title VII [or section 1981] action are whether the employment decision was motivated by discrimination based on gender, and not 'whether the employment decision is prudent or fair.'" *Lee v. GTE Fla., Inc.,* 226 F.3d 1249, 1253 (11th Cir. 2000). Again, in promotion cases, a plaintiff must do more than "assert[] baldly that [s]he was better qualified than the person who received the position at issue." *Wilson*, 376 F.3d at 1089. Instead, the plaintiff must demonstrate that the disparities between her and the successful applicant are "of such weight and significance that no reasonable person, in the exercise of impartial judgment, could have chosen the candidate selected over the plaintiff." *Harrell*, 342 F. App'x at 436 (citations omitted). Dailey has failed to make this showing or that "no reasonable person" could have chosen the successful candidates over her. In fact, Dailey acknowledges that she does not know Smith's qualifications, that she has no basis to argue she is more qualified than Smith, and that she cannot say she is more qualified than Mattson. Doc. 44-1 at 14. Therefore, in light of Dailey's failure to establish that BCBS denied her these two positions because of her race or gender, summary judgment is due to be granted also on these two selection decisions.

## 2. *Retaliation*

In light of evidence that Dorris knew about Dailey's first EEOC charge, *see* doc. 44-5 at 42, and Dorris' testimony that he "may" have shared the information with Dailey's new manager "just . . . to make him aware," *id.* at 43, the court assumes that Dailey can make a *prima facie* case of retaliation. *See McCann v. Tillman*, 526 F.3d 1370, 1376 (11th Cir. 2008) (quoting *Gupta v. Fla. Bd. of Regents*, 212 F.3d 571, 590 (11th Cir. 2000)) (a retaliation claim "requires a plaintiff to demonstrate that 'the decision-maker[s] [were] aware of the protected conduct, and that the protected activity and the adverse action were not wholly unrelated'") (alterations in original, some internal quotations omitted). Also, because BCBS has articulated a non-retaliatory reason for its selection decision, *i.e.*, management experience, the court turns next to the pretext analysis, for which Dailey relies on the same contentions. *See* doc. 57-1 at 28 ("[T]he examples of pretext already presented in support of her claims of race and sex discrimination are equally applicable here."). For the same reasons as her discrimination claims, Dailey's contentions also fail to establish that BCBS's articulated reasons are pretextual for retaliatory conduct.

Moreover, multiple individuals participated in the selection decision, and there is no evidence that all of them knew about the EEOC charge. Specifically, initially, Baumann divided the candidates into three categories, and placed Dailey

into the category of those without managerial experience. Doc. 44-6 at 3. Thereafter, an interview panel consisting of five Application Development Department managers helped to select Smith and Mattson. Doc. 44-4 at 7. Significantly, it is undisputed that Dailey lacked management experience in a work environment, doc. 44-6 at 3, 6, an attribute BCBS considered important for the job, *see* docs. 44-4 at 7; 44-5 at 45. *See Alton Packaging Corp.*, 901 F.2d at 925; *see also Holifield v. Reno*, 115 F.3d 1555, 1567 (11th Cir. 1997) (plaintiff failed to demonstrate that employer's proffered explanation was pretext for retaliation where "peer review, performance appraisals, and testimony of supervisors, colleagues, and . . . staff all show that the work for which [the plaintiff] was responsible was not performed properly during the period at issue"). Therefore, because "knowledge alone [of the protected activity] is not necessarily sufficient once the analysis moves to the pretext stage," *Knight v. Fla. Dep't of Transp.*, 291 F. App'x 955, 960 (11th Cir. 2008), and in light of Dailey's failure to sufficiently demonstrate that Dorris failed to consider her for the position in retaliation for her protected activity, Dailey's retaliation claims fail also.

### C. Application Development Unit Manager Position 2 (Counts V & VI)

Finally, Dailey also challenges a second Application Development Manager position BCBS posted four months after BCBS filled the first posting that went to Smith. Dailey claims that BCBS denied her the position, and hired Tal Richardson

(Caucasian male), because of race and gender animus, and in retaliation for her protected activity. Doc. 32 at 8–9; 15–16.

*1. Race And Gender Discrimination*

In light of Heifner's statement that Dailey met the "required qualifications for the position," doc. 44-7 at 3, the court concludes that Dailey met her burden of establishing a *prima facie* case. As such, the burden shifts to BCBS to show a legitimate, non-discriminatory reason, which BCBS met by explaining that Heifner hired Richardson because Heifner and the interview panel believed Richardson was the best applicant based on his experience. *Id.* at 3–4. More specifically, Heifner explained that Dailey only met the base qualifications for the position and did not have the preferred claims application development experience. *See id.* (Human Resources determined that Dailey "did not have the preferred senior level claims application development experience because she ha[d] worked in database administration since 1998."). In contrast, six candidates met this preferred qualification, including Richardson who had application development experience supporting ancillary applications and had worked as a Senior Applications Systems Analyst/Programmer from 1994–2014, where he spent the majority of his time supporting claims in BCBS's Application Development Department. *Id.* at 3–4, 10–11, 13. These explanations qualify as "legitimate, non-discriminatory" reasons for hiring Richardson. *See Alton Packaging Corp.*, 901 F.2d at 925.

Dailey does not deny Richardson's qualifications for the position. Doc. 44-1 at 17. Instead, to show pretext, Dailey argues that Richardson was not eligible to apply based on BCBS's internal posting policy which requires employees to have at least a year in their position before applying for other positions. *Id.*; *see also* doc. 57-1 at 26–27. Moreover, Dailey asserts that BCBS changed the rules for Richardson and tailored the position qualifications from previous Application Development Manager positions to guarantee Richardson's selection.[10] *Id.*; *see also* docs. 44-1 at 139, 146, 148; 44-3 at 18, 21, 33; 44-4 at 11–12, 29; 44-7 at 7. BCBS counters that it followed its rules and that under the COP, "[a] job posting can be posted either internally and/or externally," and that the one year service requirement applies only to the "first posting" of internal postings. Doc. 44-7 at 15; *see also id.* ("Second [internal] postings do not require any service requirement" and "there are not any service requirements [for external postings].").

There is evidence in the record to support BCBS's contention that this posting was "external." *See* doc. 44-7 at 18–19 (next to date of Dailey's application, the posting is marked as "External Posting"). Absent from this record, however, is a satisfactory explanation for why BCBS designated this particular job as such when BCBS classified the previous posting for the same job (*i.e.*, Bruce

---

[10] There are five different Application Development Manager job postings in the record. *See* docs. 44-3 at 18, 21, 33; 44-4 at 29; 44-7 at 7. All of the postings include, in the "Additional Information" section, whether the posting is a first, second, or external posting, except for the posting for the position awarded to Richardson. Doc. 44-7 at 7. This fact lends some support to Dailey's contention that BCBS may have departed from its usual practice to benefit Richardson.

Smith) as internal.[11] Doc. 44-4 at 29. Such evidence is relevant to this court's analysis given that the external designation created the eligibility opportunity for Richardson, and Dailey's contention that BCBS rigged the process to benefit Richardson. Therefore, viewing the facts in the light most favorable to the non-movant, the court finds that Dailey's assertions sufficiently suggest that, although the COP allows BCBS to post jobs externally without first posting them internally, BCBS departed from its established practice by posting this position externally and in tailoring the description of the role. *See* doc. 44-1 at 17 ("I believe it was an internal posting because it was the first time that position had been posted . . . . Typically you will see in Application Development a job posting that is posted for the first time. And then the second time that it is posted, it will have external posting or second posting open to others to apply . . . with no years of service."). Additionally, Dailey asserts that BCBS intentionally withheld information as to whether the initial posting for this position was internal or external. Doc. 44-1 at 17 ("On [BCBS's] corporate website, it tells us to look at the additional information to ascertain whether or not the position is an internal or external posting, and that additional information was intentionally left blank. And it was the first time that position had ever posted."). These contentions create a material dispute regarding whether BCBS's "established rules" *in practice* are different

---

[11] In fact, for the five Application Development Manager postings in the record, *see supra* note 10, the majority — three of five — were internal postings.

from the rules expressed in the COP, and whether BCBS bent those rules to give a non-minority applicant an edge in the hiring process. Accordingly, because "[t]he bending of established rules may, of course, be suggestive of discrimination," *Walker v. Prudential Property and Cas. Ins. Co.*, 286 F.3d 1270, 1279 (11th Cir. 2002), and "it is even more suspicious where it is alleged that established rules were bent or broken to give a non-minority applicant an edge in the hiring process," *Carter v. Three Springs Residential Treatment*, 132 F.3d 635, 644 (11th Cir. 1998), the court believes this is an issue best left for a jury.

### 2. Retaliation

For the same reasons, summary judgment is also due to be denied on the retaliation claim. The court writes further solely to address BCBS's contention that Dailey cannot establish a *prima facie* case for retaliation, because she has no evidence that Heifner — the hiring manager — knew about her protected activity. *See* doc. 43 at 18. Based upon BCBS's brief, *id.* at 15–16, and Heifner's declaration, doc. 44-7 at 3–4, Heifner worked in conjunction with Human Resources to fill this position. Specifically, Heifner crafted the job posting with unidentified individuals in Human Resources, and Human Resources screened the sixteen qualifying applicants and selected six for Heifner to interview. *Id.* at 3. Moreover, Dailey has adequately demonstrated that Human Resources played a significant role in the determination to post the position externally. *See id.* at 3, 5

(Heifner explaining that he "worked with [BCBS] human resources to develop the job posting," and  together, they "made the decision to post the position external[ly]"). Therefore, in light of Human Resources' involvement in the selection decision, including the alleged deviation from BCBS policies to favor an employee who would otherwise be ineligible for the position, and the absence of any contention that the person(s) in Human Resources did not know about the protected activity, Heifner's lack of knowledge is not dispositive.

## IV.    CONCLUSION AND ORDER

For the aforementioned reasons, BCBS's motion for summary judgment, doc. 42, is **GRANTED** as to Counts I–IV, and these counts are **DISMISSED WITH PREJUDICE**. As to Counts V and VI, the motion is **DENIED**, and this matter is **SET** for a pretrial conference on **July 5, 2017 at 11:15 A.M.**, and for trial on **August 14, 2017**, in courtroom 4A at the Hugo L. Black U.S. Courthouse in Birmingham, Alabama. The court directs the parties' attention to the attached pretrial conference instructions.

**DONE** the 12th day of May, 2017.

_____
**ABDUL K. KALLON**
UNITED STATES DISTRICT JUDGE

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA

## PRE-TRIAL DOCKET
## HON. ABDUL K. KALLON, PRESIDING

## BIRMINGHAM, ALABAMA

This case is set for a pre-trial hearing pursuant to Rule 16 of the Federal Rules of Civil Procedure. A conference-type hearing will be held in chambers in the Hugo Black Federal Courthouse in Birmingham, Alabama at the time indicated.

The hearing will address all matters provided in Rule 16, including the limitation of issues requiring trial, rulings on pleading motions, and settlement possibilities.

Counsel attending the conference are expected to be well-informed about the factual and legal issues of the case, and to have authority to enter appropriate stipulations and participate in settlement discussions. Counsel appearing at the conference will be required to proceed at trial notwithstanding the naming of others as designated trial counsel.

Promptly upon receipt of this notice, plaintiff's counsel is to initiate discussions with other counsel aimed at ascertaining which basic facts are not in dispute, at clarifying the parties' contentions (for example, just what is denied under a "general denial") and at negotiating workable procedures and deadlines for remaining discovery matters. At least four (4) business days in advance of the conference, plaintiff's counsel is to submit to chambers (via email at kallon_chambers@alnd.uscourts.gov) a proposed Pre-trial Order in WordPerfect format, furnishing other counsel with a copy. It is anticipated that in most cases the proposed order, with only minor insertions and changes, could be adopted by the court and signed at the close of the hearing.

A sample of a proposed Pre-trial Order is available on the Chamber web site (www.alnd.uscourts.gov/Kallon/Kallonpage.htm) to illustrate the format preferred by the court and also to provide additional guidance and instructions. Each order must, of course, be tailored to fit the circumstances of the individual case.

Counsel drafting this proposed order should consider the utility this

document will provide for the litigants, the jury, and the court alike. The court anticipates using the pretrial order to (1) identify and narrow the legal and factual issues remaining for trial, and (2) provide jurors with the legal and factual context of the dispute. This order should not revisit at length arguments made in previous filings with the court, nor should it serve as another venue for adversarial posturing. Pretrial orders should be simple, short, and informative.

IN ANY CASE WHERE COUNSEL HAVE ANNOUNCED SETTLEMENT TO THE COURT, A CONSENT JUDGMENT IN SATISFACTORY FORM <u>MUST</u> BE PRESENTED TO THE COURT <u>PRIOR</u> TO THE SCHEDULED TRIAL DATE; OTHERWISE, THE CASE WILL BE DISMISSED <u>WITH</u> PREJUDICE.